UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
JOSE ALEX FUENTES,                                          :
                                                            :
                                                            :
                                Petitioner,                 :        **<u>MEMORANDUM AND ORDER</u>**
                        -against-                           :
                                                            :        11-CV-5172 (SLT) (LB)
                                                            :
T. GRIFFIN,                                                 :
Superintendent,                                             :
                                Respondent.                 :
-------------------------------------------------------------------- x

**TOWNES, United States District Judge:**

      Petitioner Jose Alex Fuentes ("Petitioner") brings a habeas corpus petition pursuant to

28 U.S.C. § 2254, challenging a 2005 Kings County conviction.  Petitioner raises two grounds

for relief in his petition: (1) that the prosecution failed to turn over to the defense certain

exculpatory evidence as required by *Brady v. Maryland* that violated his due process right to a

fair trial, and (2) that he was denied his Sixth Amendment right to effective assistance of

counsel.  By order dated April 2, 2013, this court referred the petition to the Magistrate Judge for

a Report and Recommendation, which the Magistrate Judge issued on June 26, 2013 and is

attached hereto (the "R&R").  As to Petitioner's *Brady* claim, the Magistrate Judge concluded

that the New York Court of Appeals unreasonably applied clearly established federal law and

accordingly recommended that the petition for a writ of habeas corpus be granted on this basis.

As to Petitioner's ineffective assistance of counsel claim, however, the Magistrate Judge found

that although the claim was not procedurally barred, it should nonetheless be denied on the

merits.

      Both Petitioner and Respondent have filed objections to the R&R.  Respondent objects

to the R&R, asserting that contrary to the Magistrate Judge's findings, the petition should be

denied because: (1) the New York Court of Appeals did not unreasonably apply clearly

established federal law, and (2) Petitioner's ineffective assistance claim is procedurally barred. Petitioner, on the other hand, objects to the R&R solely on the basis that the Magistrate Judge erroneously denied his claim for ineffective assistance of counsel on the merits. For the reasons set forth below, the court adopts the R&R in part, rejects it in part, and denies the petition.

## I. BACKGROUND

The facts are laid out in detail in the R&R. The court therefore provides only an abbreviated background here necessary to understand the parties' objections.

### A. Factual Background

On June 9, 2004, Petitioner was arrested and charged with raping a woman two years earlier based on a DNA match. At trial, the prosecution presented eight witnesses, including the complainant. The complainant testified that after leaving an arcade alone, she arrived at her apartment building where Petitioner followed her inside. Although at first she refused to get into an elevator with him, he later returned holding a knife and forced her onto the rooftop of her apartment building, where he forced her to perform oral sex on him and penetrated her from behind. (Tr. at 368-74.) Following the assault, Petitioner put the knife away, and asked the complainant to walk with him to the subway station. (Id. at 377-78.) Petitioner told the complainant that his name was Alex, and, at the subway station, took the complainant's phone from her pocket, turned it off, wiped it off, and returned it to her. (Id. at 379.)

After leaving Petitioner, the complainant walked home and went to sleep. She did not tell her mother with whom she lived what happened, because the two did not have a good relationship and the complainant did not think her mother would believe her. The next day, however, the complainant walked to her friend Tammy's apartment and told Tammy and Tammy's mother that she had been raped. (Id. at 444.) The complainant left Tammy's

apartment and walked to Woodhull Hospital, where she reported that she had been raped. (Id. at 445-46, 551.) At the hospital, the complainant received a physical examination as well as a psychiatric consultation, memorialized in a record of consultation (the "ROC"). (Id. at 383-84; Ex. A to Amended Petition.) Individuals at the hospital contacted the police, and provided the police officers with a report of the assault. (Id. at 383-84.)

For his part, Petitioner disputed key aspects of the complainant's version of events, testifying that he and the complainant left the arcade together and that, although the two had a sexual encounter on the rooftop of her apartment building, it was consensual and he used a condom. (Tr. at 725-30.) Petitioner agreed that the two then walked to the subway together, but testified that the complainant became angry with him when it became clear that he was not interested in pursuing a relationship and wanted to "just leave things as they are." (Tr. at 757.) Petitioner testified that the complainant became angry and told him that he would "regret this." (Id. at 758.)

The Prosecution's Expert Witnesses

At the trial, in addition to the claimant and other key witnesses, the prosecution introduced testimony from two expert witnesses: Daniel McSwiggan, a nurse trained in sexual assault forensic examination, who testified that in most rape cases there is no physical trauma, and Dr. Eileen Treacy, a psychologist, who testified about rape trauma syndrome to explain the complainant's "delayed outcry." (Tr. at 624.) Petitioner objected to both of these experts' testimonies, but the court overruled the objections and permitted them to testify.

Nurse McSwiggan, who had not examined the complainant, testified that although the complainant had no vaginal trauma, such was the case in "90 percent of rapes that occur." (Tr. at 564-66.) On cross-examination, Petitioner's counsel did not question the "90 percent" statistic, but elicited testimony that the complainant, throughout her physical examination,

3

exhibited a general appearance and demeanor that were within normal limits. Petitioner's counsel also elicited testimony that the physician assistant's report from the complainant's examination indicated, by marking a box, that penetration was only "attempted," and not "successful." (Tr. at 592-96.)

Dr. Treacy testified that rape trauma syndrome provides a framework for understanding why some rape victims act in a manner that others might view as illogical in the aftermath of an assault, such as returning home and washing all of the medical evidence away because of a desire to "get[ ] clean," as opposed to a concern for preserving evidence. Treacy acknowledged that responses to rape vary in each individual case, but said that two categories of responses include those who exhibit emotions freely and those who are more controlled, and, therefore, lack "visible signs of upset." (Tr. at 650.) She testified that a rape victim who does not have a good relationship with her mother may not necessarily disclose the rape to her mother. Indeed, over Petitioner's counsels objections, she testified that she harbors "no expectation that a victim would tell the first person that they've seen [that they were raped]." (Tr. at 655.) On cross-examination, although Petitioner's counsel did not challenge Treacy's claims regarding rape trauma syndrome as a framework for understanding rape victims' responses, in response to Petitioner's counsel's questions, Treacy confirmed that she had no opinion regarding the complainant's behavior and that rape trauma syndrome is inapplicable to situations where the sex was consensual. (Tr. at 659.) Petitioner's counsel did not elicit any testimony regarding judges' criticism of Treacy's testimony in prior cases.

<u>The Record of Consultation</u>

During defense counsel's summation at trial, counsel stumbled upon the ROC in the complainant's medical records and realized that the document had not previously been produced to him. (Tr. at 784-86.) The ROC indicated that the complainant had been examined

by a Woodhull Hospital psychologist on the day of the alleged rape, January 27, 2002, and that the complainant "report[ed] depression x 9 Y and ideas of killing herself since then, because she has 'family problems' feeling mistreated by mother, frequent crying spells, withdrawn, lack of energy. Now, she feels angry at herself 'because she went home late and put herself at risk.' Fair sleep – she has no [suicidal ideation] currently and her depression is 'as usual.'" (Ex. A to Amended Pet.) The ROC further indicated that the complainant had twice used marijuana in the last year, and described the following: "mood depressed, denied [suicidal/homicidal] ideation or [auditory/visual] hallucinations, no delusions elicited." (Id.) Finally, the ROC indicated that the complainant suffered from "dysthmic disorder" and noted that she "wants someone to talk to about her problems." (Id.) As a result, the examining psychologist suggested a referral to a psych clinic upon discharge. (Id.)

The defense moved for a mistrial, arguing that the ROC was *Brady* material and that the prosecution's failure to turn the document over to the defense violated Petitioner's right to a fair trial. More to the point, counsel argued that, had the prosecution provided the document to him, he would have had a basis during the trial to call into question the complainant's mental health. (Tr. at 81, 861-62.) The prosecutor admitted to the court that she had removed the ROC from the file produced to Petitioner's counsel, but stated that she had done so because she did not believe the document was discoverable. (Tr. at 848-49.) The trial court judge admonished the prosecutor for not seeking a court ruling on whether the document should have been provided to the defense, but ultimately denied defense counsel's motion for a mistrial. (Id. at 865-67, S. 2-3, 7-8.)

On November 3, 2005, the jury returned a guilty verdict, and the trial court sentenced Petitioner to 25 years imprisonment for rape and sodomy. (S. at 2-3, 7-8.)

B. <u>Procedural History</u>

<u>The Alleged *Brady* Violation</u>

Petitioner appealed his conviction, asserting that the ROC was *Brady* material and that the prosecution's decision to withhold such information deprived him of a fair trial. The Appellate Division affirmed his conviction. *See People v. Fuentes*, 851 N.Y.S. 2d 628 (2d Dep't 2008). Petitioner then appealed to the New York Court of Appeals. In a 5-2 decision, a majority of the Court of Appeals affirmed the Appellate Division's decision, holding that the ROC was not material for *Brady* purposes and that the prosecutor's decision to withhold that information, "while ill-advised, does not constitute a *Brady* violation." *People v. Fuentes*, 12 N.Y. 3d 259, 260 (2009). The Court of Appeals concluded that the ROC was not material for the following reasons. First, the court found that the ROC was "unclear" as to whether the complainant's suicidal ideation was "the result of having been raped only hours earlier, or due to more general feelings of depression, stemming from a strained relationship with her mother." *Fuentes*, 12 N.Y.3d at 264. Second, the Court of Appeals noted that the ROC indicated that the complainant did not suffer from any psychiatric conditions that would lead her to experience hallucinations or delusions. *Id.* Third, because the ROC indicated that the complainant had used marijuana only twice in the past year, which would not have impaired her perceptions, "the value of the undisclosed information as admissible impeachment evidence would have been minimal, at best." *Id.* Fourth, Petitioner's version of events was contradicted in several key respects by the testimonies of both the complainant and her friend. *Id.* And fifth, the court found that it was "contrary to common sense" that the complainant would subject herself to a hospital examination to exact revenge against Petitioner, when she "did not have a way of leading the police to [him], or any reason to be confident he would ever be caught; he was not identified until the DNA match was found years later." *Id.* at 265.

6

<u>Petitioner's Ineffective Assistance of Counsel Claim</u>

Petitioner also filed two motions to vacate his conviction pursuant to N.Y. Crim. Proc. Law Section 440.10.  In the second of these motions, he raised a claim that his trial counsel had been constitutionally ineffective.  The Appellate Division denied this motion, concluding that the issue was procedurally barred.  Alternatively, the Appellate Division noted that "[e]ven if the court were to address the substance of [Petitioner's] motion, there would be no merit found within his arguments."  (Ex. D to Amended Petition at 4.)  In this regard, the Appellate Division found that, despite the "multitude of complaints against his trial counsel, ranging from a failure to convey a plea bargain offer to [him], to a failure to investigate mitigating factors at his sentencing, these facts are unsubstantiated by any other evidence save the defendant's own claims, and must fail as well."  (Id. at 5.)  The Appellate Division therefore concluded that there was "no 'reasonable possibility' that the claims alleged by the [Petitioner], for which he has failed to adequately demonstrate a sufficient factual basis, are true.  (Id.)

## II. DISCUSSION

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—"

"(1) resulted in a decision that was contrary to, or involved an unreasonable *784 application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or

"(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Federal habeas relief may not be granted for claims subject to section 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established by the holdings of the Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); § 2254(d)(1), (d)(2).

A. Petitioner's *Brady* Claim

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). However, "[a] reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v. Cain*, -- U.S. –, 132 S. Ct. 627, 630 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

In affirming the Appellate Division's decision denying Petitioner's appeal of his conviction, the New York Court of Appeals determined that the prosecutor's failure to disclose the record of consultation was not material. In so doing, the Court of Appeals evaluated whether "there existed a 'reasonable possibility' that [the disclosure of the record of consultation] would have changed the result of the proceedings." *People v. Fuentes*, 12 N.Y.3d at 263 (quoting *Vilardi*, 76 N.Y.2d at 77). The Magistrate Judge concluded that because any undisclosed evidence that would meet the "reasonable possibility" standard of materiality

applied by the Court of Appeals would also fall within the "reasonable probability" requirement established by Supreme Court precedent, the Court of Appeals' decision was not "contrary to" clearly established federal law. (R&R at 16-17.) The parties have not objected to this portion of the R&R and the court finds no clear error with the R&R in this regard.

The Magistrate Judge also considered whether the Court of Appeals' decision was an unreasonable application of federal law. Notwithstanding the "high standard of deference" the Magistrate Judge accorded the Court of Appeals, the court concluded that the majority's determination that the ROC was not material was objectively unreasonable. The Supreme Court has indicated that the question of whether a state court's determination is "unreasonable" for purposes of habeas review is necessarily different from the question of whether the federal court would have reached the same determination had the case arrived on direct review. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Thus, "[f]or purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (emphasis in original) (quoting *Williams*, 529 U.S. 362, 410 (2000)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [legal standard] standard itself." *Id.*

A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Thus, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (internal quotation marks omitted). As the Supreme

Court has instructed, under section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington*, 131 S. Ct. at 786. Moreover, the Court has admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review" and has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*; *Renico v. Lett*, 559 U.S. 766, 773 (2010) (stating that section 2254(d)(1) "creates 'a substantially higher threshold' for obtaining relief than de novo review" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007))). Thus, the relevant question here is whether, pursuant to Supreme Court precedent, it was "clearly established" by federal law that mental health information such as the type contained in the ROC is "material" for *Brady* purposes. "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786. For reasons described more fully below, the court concludes that it was not clearly established by federal law that the information contained in the ROC was material for *Brady* purposes. As a result, the court rejects the conclusion in the R&R that the Court of Appeals unreasonably applied federal law in affirming Petitioner's conviction.

The determination in the R&R that the Court of Appeals' decision regarding the ROC was unreasonable is based on the following: (1) that the Court of Appeals misread the record of consultation, (2) that this incorrect reading of the record of consultation precluded the Court of Appeals from fairly considering the effect that the prosecutor's failure to disclose it had on the fairness of the trial, and (3) that, despite iterating a proper standard for materiality, the Court of Appeals applied the standard in an unreasonable manner.

As an initial matter, the court agrees with the Magistrate Judge that the Court of Appeals

misread one aspect of the ROC.  The Court of Appeals found that the ROC was "unclear" as to whether the complainant's suicidal thoughts stemmed from the rape hours earlier or from more general feelings of depression.  *See Fuentes*, 12 N.Y. 3d at 264.  However, as the R&R notes, the ROC clearly indicates that the complainant had reported depression for several years and that she had "ideas of killing herself since then."  (Ex. A to the Amended Petition.)  The ROC also elaborated that, apart from any recent incident that might have caused the suicidal thoughts, such thoughts emanated from her "'family problems,' feeling mistreated by mother, frequent crying spells, withdrawn, lack of energy."  (Id.)  Moreover, the ROC indicates that the complainant was diagnosed with I Dysthmic Disorder which, as the R&R points out, "is a depressive disorder characterized by the presence of a 'chronically depressed mood that occurs for most of the day, more days than not, for at least two [consecutive] years."  (R&R at 18-19.) Notwithstanding this error, the court disagrees with the conclusion in the R&R that this misreading "precluded a fair-minded view of the effect that the prosecutor's failure to disclose [the ROC] had on the fairness of the trial."  (R&R at 19.)

In deciding that the ROC was not material, the Court of Appeals did not rely solely, or even primarily, on the fact that it found the ROC to be ambiguous as to whether the complainant's suicidal thoughts were caused by the rape or not.  Rather, the Court of Appeals provided several equally important grounds for its conclusion.  First, it noted that the ROC indicated that the complainant did not suffer from any psychiatric conditions that would lead her to experience hallucinations or delusions.  *See Fuentes*,12 N.Y. 3d at 264.  Second, the Court of Appeals noted that despite the fact that the complainant had used marijuana, she had done so only twice in the past year, and therefore would not have suffered any impairment to her perceptions, and that "nowhere in the [ROC] does it state that she took any other substances that could have seriously impacted or impaired her perceptions of reality."  *Id.* at 264.

Accordingly, the Court of Appeals determined that "the value of the undisclosed information as admissible impeachment evidence would have been minimal, at best." *Id.*

The Supreme Court has not addressed whether mental health information such as the type contained in the ROC is considered "material" for *Brady* purposes. Federal courts in this circuit that have considered the issue, however, have denied habeas relief under analogous circumstances. In *Brazeau v. Zon*, the district court denied habeas relief pursuant to section 2254 based on a claim that the prosecution had withheld allegedly exculpatory mental health information because, "even if [the petitioner] could have established that the victim was a 'suicide risk' taking 'psychotic [*sic*] medication,' that does not necessarily mean that "[the victim] was incapable of accurately and truthfully perceiving and recalling events." 2007 WL 2903617, at *30 (W.D.N.Y. Oct. 1, 2007) (second alteration in original). Indeed, the district court noted that "there was no indication at trial that the victim's ability to observe or recount events on the date of the robbery and assault or at trial was impaired by medication, alcohol, or any other controlled substance." *Id.* Similarly, in *Chandras v. McGinnis*, a district court denied habeas relief to a petitioner pursuant to section 2254 on the basis that the prosecutor had withheld favorable impeachment information in the form of information about a key witness's mental health because "there is no indication that [the witness's] mental illness impaired his ability to perceive or recount events either on the date of the robbery or during trial." 2002 WL 31946711, at *9 (E.D.N.Y. Nov. 13, 2002). Given the absence of such information, the court concluded that the psychiatric information was not material for *Brady* purposes. *Id.* In light of this precedent, and the absence of any Supreme Court holding to the contrary, the court concludes that the Court of Appeals' determination that the complainant's ROC -- which in no way suggested that she was unable to accurately and truthfully perceive and recall events -- was one about which "fairminded jurists could disagree [as to whether it] conflicts with [the

Supreme] Court's precedents." *Harrington*, 131 S. Ct. at 786. As such, the Court of Appeals' conclusion that the ROC was not material constitutes a reasonable application of federal law.

The court's decision is bolstered by opinions interpreting the Supreme Court's precedents that have been rendered by courts outside this circuit, but who have reached similar conclusions. In *Browning v. Trammell,* 2011 WL 2604744 (N.D. Okla. June 30, 2011), *aff'd by*, 717 F.3d 1092, 1106 (10th Cir. 2013), a federal district court concluded that the Oklahoma Court of Criminal Appeals had unreasonably applied clearly established federal law by affirming the defendant's convictions and sentences despite the fact that the prosecution had failed to provide to the defense psychological records. The district court, in granting habeas relief, noted that the psychological records were material because they documented a mental illness "of the type and severity that other courts have recognized would likely have an impact on a witness's veracity and credibility." *Browning*, 2011 WL 2604744, at *6. Indeed, as the district court explained, the records established that the government witness "suffered from severe mental illness which could affect her ability to recount events accurately" and that "she was also prone to manipulate and blame others." *Id.* at *7. Accordingly, the district court concluded that "the evidence of severe mental illness affecting [the witness's] veracity and ability to recount events accurately surely may have created sufficient doubts as to [the defendant's] involvement in the crimes in the minds of at least some of the jurors, particularly in the absence of other evidence linking him to the actual crimes" and was, therefore, material for *Brady* purposes. *Id.* at *9. On appeal, the Tenth Circuit Court of Appeals similarly emphasized the fact that the psychiatric records implicated the witness's ability to tell the truth and distinguish between reality and fiction. In affirming the district court's opinion, the Tenth Circuit concluded that it "is difficult to see how the Oklahoma courts could reasonably conclude there was nothing material about a recent diagnosis of a severe mental disorder that made [the witness] hostile, assaultive,

13

combative, and even potentially homicidal, or that [the witness] was known to blur reality and fantasy and project blame onto others." *Browning*, 717 F.3d 1092, 1106 (10th Cir. 2013).

Moreover, at least one circuit court has implied that psychiatric material such as that at issue here is not even relevant to a witness's credibility, much less material, for purposes of *Brady.* In *United States v. Butt*, 955 F.2d 77 (1st Cir. 1992), although not involving a habeas petition or a *Brady* claim, the First Circuit Court of Appeals discussed under what circumstances certain psychological records would be deemed relevant to impeach a witness. The government had learned that its key witness had attempted to commit suicide a few years earlier and had been hospitalized and examined as a result. *Id.* at 80. The defendants, believing such information would be helpful to impeach the witness's credibility, sought to introduce a redacted version of the psychological report into evidence. The district court denied the request, concluding that the report was not relevant to the witness's credibility, despite the suggestion that she was mentally unstable at a time covering events about which she later testified. *Id.* at 82. The defendants appealed, citing "longstanding precedent that evidence of mental instability is relevant for purposes of impeaching a government witness," and arguing that the district court abused its discretion in deeming such psychological history irrelevant. *Id.*

The First Circuit Court of Appeals, in a panel that included now-Supreme Court Justice Stephen Breyer, affirmed the district court's decision. In so doing, the court recognized the federal precedent relied on by the defendants in that case, but nonetheless noted that it was "aware of no court to have found relevant an informally diagnosed depression or personality defect. Rather, federal courts appear to have found mental instability relevant *only* where, during the time-frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth." *Id.* at 82-83 (emphasis added). Indeed, the

First Circuit was "impressed . . . by the absence of . . . any diagnosis of a mental illness which would prevent [the witness] from perceiving matters truthfully and testifying about them." *Id.* (alterations in original omitted).

In the R&R, the Magistrate Judge acknowledges the "high standard of deference" owed to the Court of Appeals' determination under AEDPA. Nonetheless, the R&R provides several reasons why, upon conducting its own materiality analysis, it believed the Court of Appeals' decision to be objectively unreasonable. The R&R emphasizes that, by failing to disclose the ROC, Petitioner's defense attorney did not have any basis to investigate the complainant's psychological condition or cross-examine the complainant regarding her self-reported emotional instability. (*See* R&R at 19, 21-22.) The R&R also found the prosecutor's failure to disclose the ROC particularly significant because the complainant's credibility was critical to the jury trial and the issue of consent. (R&R at 20.) As the Supreme Court has cautioned, however, in applying the "unreasonable application" clause, a reviewing court must be careful not to substitute its own judgment for that of the state court by equating the more stringent standard of "objectively unreasonable" with the more lax standard of "clear error." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Thus, the mere fact that the Magistrate Judge, conducting a *de novo* review, would have reached a different conclusion, is insufficient to warrant relief. Rather, a federal habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011). The court therefore rejects the conclusion in the R&R regarding Petitioner's *Brady* claim to this extent.

The court also rejects the conclusion in the R&R that the Court of Appeals unreasonably applied the "reasonable possibility" standard because it noted that "disclosure of this [ROC]

would not have altered the outcome of the case." *Fuentes*, 12 N.Y.3d at 263-64. The R&R provides no basis for this conclusion, beyond its assertion that the "Court of Appeals applied the standard in an unreasonable manner." (R&R at 22.) As Respondent argues in his objections to the R&R, however, the notion that the Court of Appeals misapplied the "reasonable possibility" standard is belied by the court's decision. In the paragraph immediately before the one at issue, the Court of Appeals iterated the full and correct "reasonable possibility" standard, noting that a document will be deemed material, not only if it would change the outcome of the case, but also if "there exists a 'reasonable possibility' that it would have changed the result of the proceedings." *Id.* at 263 (quoting *People v. Vilardi*, 76 NY2d 67, 77 (1990)). Moreover, in the sentence directly preceding the statement seized upon by the R&R, the Court of Appeals directly references the "reasonable possibility" standard set forth in the preceding paragraph. Thus, while not a model of draftsmanship, in this context, the court does not conclude that the Court of Appeals, by failing to reiterate for a third time the phrase "reasonable possibility," was intending to apply a higher standard to Petitioner's claims. Indeed, after discussing the absence of any information regarding the complainant's ability to tell the truth or recall events in the ROC, the Court of Appeals concluded that the ROC was "immaterial *and* would not have changed the outcome of the trial." *Id.* at 265; *see also id.* at 264 (noting that in finding the ROC immaterial, the Court of Appeals also found that it "would not have altered the outcome of the case."). The Court of Appeals did not conclude, as it likely would have had it applied a higher standard of materiality, that the ROC was immaterial *because* it would not have changed the outcome of the trial. Accordingly, the court declines to adopt the R&R as it pertains to Petitioner's *Brady* claim and denies the petition in this regard.

B. Ineffective Assistance of Counsel

As an initial matter, the court notes that it fully adopts the R&R as it pertains to

Petitioner's claim of ineffective assistance of counsel. Nonetheless, it will briefly address here the specific objections to the R&R raised by Petitioner. In addressing Petitioner's claim of ineffective assistance of counsel, the Magistrate Judge concluded that the claim was not procedurally barred. (R&R at 24-25.) The court has reviewed this portion of the R&R and, notwithstanding Respondent's objections, concludes, as the R&R did, that, because the Appellate Division did not appoint Petitioner counsel on his 440.10 motion and he has demonstrated that his ineffective assistance of counsel claim "has some merit," his claim is not procedurally barred. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012) (noting that a prisoner may overcome a requirement that he raise an ineffective assistance of counsel claim in a collateral proceeding when the state court does not appoint counsel in the initial-review collateral proceeding and the prisoner demonstrates that his claim has "some merit.").

Continuing, although the court has found that Petitioner's ineffective assistance claim is not procedurally barred, it nonetheless concludes, as the R&R did, that the claim fails on the merits. Petitioner has argued that his trial counsel was ineffective because: (1) his counsel failed to consult an expert to effectively challenge Dr. Treacy's testimony, (2) his counsel failed to challenge the testimony of Nurse McSwiggan, and (3) his counsel failed to interview hospital personnel or request forensic testing to determine whether latex was preset, which, Petitioner argues, would have corroborated his testimony that he had used a condom. The Magistrate Judge rejected each of these claims. As to counsel's alleged failure to challenge the testimony by Treacy and McSwiggan, the R&R noted that defense counsel "fought vigorously to keep out [these] experts," and "moved for a mistrial based on the testimony of a DNA expert which petitioner's counsel argued was unnecessary in light of the fact that petitioner did not dispute intercourse." (R&R at 26.) Moreover, upon the court's decision to allow such testimony, the R&R noted that petitioner's counsel elicited several important concessions from Treacy,

including that she had not examined the complainant and that her testimony would not be relevant if the jury found that the sex had been consensual, and he confined McSwiggan's testimony to the mere inconclusiveness of the medical records. (R&R at 27-28.) Finally, the R&R noted that petitioner's case was one "where the experts' testimony was minimally applicable to the prosecution's case." (R&R at 27.)

Petitioner, in his objections to the R&R, does not dispute any of these findings. In fact, Petitioner acknowledges that these expert witnesses were "not the most important" at trial, and describes their contribution to the prosecution's case as "marginal." (Pet. Obj. At 7, 8.) Petitioner further appears to concede that his trial counsel may well have chosen not to more rigorously challenge these experts' opinions in front of the jury because their testimonies added little to the prosecution's case and an effort on the part of his trial counsel to aggressively challenge could magnify the importance of their testimonies in the eyes of the jury. (R&R at 7.) Notwithstanding these objectively reasonable bases for declining to pursue an aggressive line of questioning against these witnesses, Petitioner argues that his trial counsel's failure to more rigorously challenge these experts' testimonies on the stand constitutes ineffective assistance because this was "a very close case." (Pet. Obj. at 7-8.) Essentially, Petitioner's argument is that, under such circumstances, any error by trial counsel could have tipped the scales of justice in his favor and should, therefore, be construed as constitutional error. This is simply not the standard. *See Halo v. United States*, 2007 WL 1299158, at *7 (E.D.N.Y. Feb. 5, 2007), *report and recommendation adopted by* 2007 WL 1299158, at *5 (E.D.N.Y. Apr. 30, 2007) ("It is well settled that not every error or mistake made by counsel will constitute ineffective assistance.") (citing *Morris v. Garvin*, 2000 WL 1692845, at *3 (E.D.N.Y. Oct. 10, 2000)); *see also Strickland*, 466 U.S. at 689, 693 ("Judicial scrutiny of counsel's performance must be highly deferential" and observing that "[a]ttorney errors . . . are as likely to be utterly harmless in a particular case

as they are to be prejudicial").  Accordingly, given the minimal role the experts' testimony played in the prosecution's case, counsel's failure to call a medical expert was not a violation of the *Strickland* standard.  *Cf. Bell*, 500 F.3d at 157 (there is no "*per se* rule requiring a defense counsel to consult with a medical expert in order to cast doubt on a key prosecution witness.").[1]

The R&R also correctly determined that Petitioner's argument that his trial counsel was constitutionally deficient because he failed to interview hospital personnel or pursue favorable forensic evidence lacks merit.  As the R&R stated, there is no evidence that any investigation on the part of Petitioner's counsel would have resulted in positive results for Petitioner's case. Thus, even assuming Petitioner's counsel should have conducted such an investigation, his argument that the investigation *could* have yielded the presence of latex, which would have corroborated his story is simply too speculative to satisfy the "high bar" demanded by the *Strickland* standard*.  See Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) (("Surmounting *Strickland's* high bar is never an easy task."); *see also Taylor v. Poole*, 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009) ("[V]ague, conclusory or speculative [assertions] as to what evidence could have been produced by further investigation" insufficient to support a *Strickland* claim); *Greiner v Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (counsel's duty to investigation "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense.").

---

[1] Petitioner also argues that his counsel's performance was ineffective because, had he been adequately prepared, he could have introduced certain studies that supported his case and undermined the view presented by the prosecution's experts.  However, as the R&R noted, these studies were not presented to the state court and cannot be considered here.  (R&R at 28 n.12.)  Moreover, in light of the minimal role these experts' testimonies played in the prosecution's case against Petitioner, failure on the part of Petitioner's trial counsel to cite the literature proffered by Petitioner here does not render his counsels' performance constitutionally ineffective.

Finally, the court agrees with the conclusion in the R&R that, even considering trial counsel's alleged errors "in the aggregate," Petitioner has failed to establish that his trial counsel's representation was constitutionally ineffective. The operative question under *Strickland* is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. At 788. As the R&R correctly noted, "in light of the 'significant deference we accord trial counsel's decision on how to conduct cross examination and our refusal to use perfect hindsight to criticize unsuccessful trial strategies," the court cannot conclude that trial counsel was constitutionally ineffective. Accordingly, the Appellate Division's decision regarding Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, federal law as determined by the Supreme Court.

III. CONCLUSION

For the reasons stated above, the court REJECTS the R&R [62] to the extent it recommended granting Petitioner habeas relief on his *Brady* claim and instead concludes that the Court of Appeals' determination regarding the materiality of the ROC was not an unreasonable application of clearly established federal law. FURTHER, the court ADOPTS the R&R with regard to Petitioner's claim for ineffective assistance of counsel. Accordingly, the amended petition for a writ of habeas corpus [51] is DENIED. No certificate of appealability is granted as Petitioner has made no substantial showing of the denial of a constitutional right. The Clerk of Court is directed to enter judgment denying the petition and closing this case.

SO ORDERED.

_____S/_____
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2014
Brooklyn, New York